# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2364-23

E.A.M.,

    Plaintiff-Respondent,

v.

J.N.W.,

    Defendant-Appellant.

_____

Submitted April 2, 2025 – Decided April 21, 2025

Before Judges DeAlmeida and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FV-09-0728-24.

The Tormey Law Firm, attorney for appellant (Louis J. Keleher, on the brief).

David R. Bennett (Bennett & Associates, PA), attorney for respondent (David R. Bennett, on the brief).

PER CURIAM

Defendant J.N.W. (Jack)[1] appeals from a February 22, 2024 final restraining order (FRO) entered against him by the Family Part pursuant to the Prevention of Domestic Violence Act (the Act), N.J.S.A. 2C:25-17 to -35. We affirm.

I.

In 2023, Jack and plaintiff E.A.M. (Ellen) were in a three-year romantic relationship and lived together in a Hudson County apartment. On the night of August 28, 2023, they had a heated argument in front of their apartment building. As they argued, Jack and Ellen walked along the sidewalk and approached a corner. Jack, who is taller than Ellen, arrived at the corner first and turned the corner. By the time Ellen arrived at the corner, she thought Jack "was long gone." However, when Ellen turned the corner, Jack was "standing right at the corner facing" Ellen, "as if he was waiting for [her] to turn." As soon as Ellen came around the corner, she stopped and Jack dumped a bottle of water over Ellen's head and face.

Ellen "went into a panic" and was "in fear of where [Jack's] level of aggression was going to go." The water caused Ellen's mascara to run into her

[1] We use initials and pseudonyms to preserve the confidentiality of court records concerning domestic violence. R. 1:38-3(d)(9).

eyes, limiting her vision and exacerbating her alarm. In an effort to protect herself, Ellen pushed and hit Jack.

The two continued their argument and eventually returned to their apartment. Jack decided to vacate the apartment that night, taking half of his possessions. He returned to the apartment two days later when Ellen was at work and removed the remainder of his possessions.

On September 2, 2023, Jack texted Ellen and told her he could not find a place to live and intended to move back into the apartment. He stated he would sleep on the couch while Ellen slept in the bedroom. Ellen told Jack not to return to the apartment because she did not feel safe. She told Jack that because he was not on the lease, she was not required to allow him to live in the apartment. Jack responded that he was coming to the apartment building anyway, she needed to let him in, he would not leave until she did so, and she could call the police.

Ellen called the police and informed building employees not to permit Jack to enter the apartment building. After Jack appeared at the building, police officers encountered Jack and convinced him to leave the premises.

Also on September 2, 2023, Ellen filed a domestic violence complaint in the Family Part requesting entry of a temporary restraining order (TRO) against

Jack. Ellen alleged Jack committed the predicate act of harassment, N.J.S.A. 2C:33-4, based on the August 28, 2023 incident.[2]

On September 2, 2023, the court entered a TRO against Jack. The TRO, which included a date for the parties to return to court, prohibited Jack from contacting Ellen.

On September 11, 2023, shortly after an initial court hearing on the FRO application, Jack sent Ellen a text with an image indicating his location and a request to meet and talk. The text was from an unfamiliar phone number, which left Ellen uncertain of who had sent the message. Jack thereafter sent Ellen a screen shot of his location from his regular phone number and an email with the same information from his regular email account to demonstrate that he sent the original text. The exchange made Ellen feel increasingly unsafe, particularly because he contacted her shortly after a court hearing on the FRO, used three methods of communication to reach her, and asked to meet in person.

---

[2] Jack did not include a copy of the complaint in his appendix. We surmise the allegations Ellen set forth in the complaint based on her testimony at the trial. Jack's failure to include the pleadings in his appendix hindered our review of the record. See R. 2:6-1(a)(1) ("Required Contents. The appendix prepared by the appellant or jointly by the appellant and respondent shall contain (A) in civil actions . . . the pleadings . . . .").

A-2364-23

On September 13, 2023, Jack sent Ellen a text and an email while she was at work. He told Ellen to stop ignoring his calls, that he wanted to restart their romantic relationship, and said his "head is not in the right place." Jack's communications concerned Ellen, given that he was violating the TRO and, in her view, increasing the level of his aggression. Ellen's concern was informed by her knowledge of Jack's history of mental health issues, including depression, for which he was prescribed medication.

On September 14, 2023, Ellen amended her complaint to allege Jack violated the TRO by repeatedly contacting her. She did not, however, allege violation of the TRO as a predicate act of domestic violence because the box on the form for that allegation had not been checked by court staff.[3]

On November 3, 2023, Ellen again amended the complaint. We do not have a copy of the November 3, 2023 amended complaint and cannot discern from the record the nature of the amendment.

On February 22, 2024, the court held a trial at which Ellen and Jack testified. Ellen recounted the details of the August 28, 2023, and September 2,

---

[3] Because Jack did not include the amended complaint in his appendix, we describe the contents of the amended complaint based on comments by the court at the trial. The court stated the amended complaint alleged Jack contacted Ellen in violation of the TRO on November 11, 2023. It is not clear if the court misspoke or was referring to a separate instance of Jack violating the TRO.

A-2364-23

2023 incidents, as well as Jack's subsequent communications after entry of the TRO. She also testified she required an FRO because Jack demonstrated he had no respect for the law by violating the TRO, was displaying an increasing level of aggression towards her, and was unlikely to refrain from contacting her and threatening her safety in the absence of an FRO. Ellen described a prior court hearing in this matter at which the judge ejected Jack from the courtroom for an outburst, requiring Ellen to be ushered into another room by sheriff's officers for her safety. Jack did not dispute Ellen's account of that incident.

Jack testified that during the August 28, 2023 argument, Ellen chased him from in front of their apartment building to a nearby sports stadium despite his pleas to be left alone. According to Jack, Ellen struck him, knocking a water bottle out of his hand, which caused Ellen to be splashed with water. Jack played an audio recording of a conversation between the parties on August 28, 2023, in which Jack can be heard saying "leave me alone" and Ellen can be heard responding "and if I don't what are you going to do?"

Jack conceded that he repeatedly contacted Ellen after entry of the TRO, which he knew prohibited him from doing so. Jack also acknowledged he was prescribed medication for mental health issues and had not taken that medication since he moved out of Ellen's apartment.

After the close of the trial, the court issued an oral opinion granting Ellen's request for an FRO. The court found Ellen's testimony credible, straightforward, and not embellished. On the other hand, the court found Jack's testimony was vague, "not always accurate" and "somewhat confusing."

The court found credible Ellen's testimony that Jack intentionally dumped a bottle of water on her head during the August 28, 2023 argument. The court found Jack's version of the events of August 28, 2023, to be "difficult to believe," particularly in light of the physical differences between the parties. Thus, the court found Jack committed the predicate act of harassment.

In addition, the court found Ellen proved Jack contacted her repeatedly after issuance of the TRO, despite being aware the TRO prohibited him from doing so. The court sua sponte amended the complaint to allege the predicate act of violation of the TRO and found Ellen had established that predicate act.

The court also found Ellen was in need of an FRO against Jack to protect her from future acts of domestic violence. The court found Jack "completely disregarded" the TRO, justifying Ellen's reasonable fear for her safety and need for protection. In addition, the court found Jack's admitted mental health issues and failure to take prescribed medication for those conditions corroborated

7

Ellen's fear and underscored the need for an FRO. On February 22, 2024, the court entered an FRO against Jack.

This appeal followed. Jack argues: (1) the trial court's conclusion he committed the predicate act of harassment is not supported by credible evidence because Ellen's testimony was not reliable, she did not prove Jack acted with the purpose to harass her, and the evidence establishes only ordinary domestic contretemps between the parties on August 28, 2023; (2) the trial court erred when it found his testimony lacked credibility; (3) there was insufficient evidence adduced at trial to support the trial court's conclusion that Ellen was in need of an FRO to protect her from future acts of domestic violence, given that the audio recording demonstrated Ellen was not in fear of Jack; and (4) the trial court inappropriately coached Ellen by repeatedly asking her why she thought she was in need of an FRO until Ellen gave an answer that satisfied the court.

II.

"In our review of a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013) (citing Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). We should not disturb the "factual findings and legal

conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). Deference is particularly appropriate when the evidence is testimonial and involves credibility issues because the judge who observes the witnesses and hears the testimony has a perspective the reviewing court does not enjoy. Pascale v. Pascale, 113 N.J. 20, 33 (1988) (citing Gallo v. Gallo, 66 N.J. Super. 1, 5 (App. Div. 1961)).

The entry of an FRO requires the trial court to make certain findings. See Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). The court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125. The court should make this determination "in light of the previous history of violence between the parties." Ibid. (quoting Cesare, 154 N.J. at 402).

Next, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further

abuse." Id. at 127 (citing N.J.S.A. 2C:25-29(b)); see also J.D. v. M.D.F., 207 N.J. 458, 475-76 (2011). This determination requires evaluation of:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety; and
>
> (6) The existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a); see also Cesare, 154 N.J. at 401.]

Here, the trial court determined that Jack committed harassment, one of the predicate acts set forth in the Act. N.J.S.A. 2C:25-19(a)(13). A person commits harassment if, "with purpose to harass another," he or she:

> (a) Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> (b) Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

10

> (c)     Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4.]

For a finding of harassment under N.J.S.A. 2C:33-4, the actor must have the purpose to harass. Corrente v. Corrente, 281 N.J. Super. 243, 249 (App. Div. 1995) (citing D.C. v. T.H., 269 N.J. Super. 458, 461-62 (App. Div. 1994); E.K. v. G.K., 241 N.J. Super. 567, 570 (App. Div. 1990)). Finding a party had the purpose to harass must be supported by "some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D., 207 N.J. at 487 (citing State v. Fuchs, 230 N.J. Super. 420, 428 (App. Div. 1989)). A purpose to harass may be inferred from the evidence. See State v. McDougald, 120 N.J. 523, 566-67 (1990). Common sense and experience may also inform a determination or finding of purpose. State v. Hoffman, 149 N.J. 564, 577 (1997) (citing State v. Richards, 155 N.J. Super. 106, 118 (App. Div. 1978)). "[T]he decision about whether a particular series of events rises to the level of harassment or not is fact-sensitive." J.D., 207 N.J. at 484.

We have reviewed the record and conclude it contains sufficient credible evidence supporting the trial court's finding that Jack harassed Ellen when he

11

intentionally poured a bottle of water over her head during an argument. The court had the opportunity to observe the testimony of Ellen and Jack and to evaluate their credibility. The court accepted as credible Ellen's version of the events of August 28, 2023, noting her testimony was straightforward, not embellished, and consistent. The court found Jack's testimony to be vague, not accurate, and confusing. Based on Ellen's testimony, the court concluded Jack turned a corner and, being taller than Ellen, stopped and waited for her to turn the corner so he could startle her and unexpectedly drench her with water.

There is ample support in the record for the court's finding that Jack's conduct amounted to an "offensive touching" or "course of alarming conduct" within the meaning of N.J.S.A. 2C:33-4. In addition, although the trial court did not expressly find that Jack acted with the purpose to harass Ellen, common sense and experience support the conclusion there is no plausible explanation for his behavior other than an intention to startle, alarm, and annoy Ellen by drenching her with water while she was on a public sidewalk.

We are mindful of our duty to "[d]raw[] the line between acts that constitute harassment for purposes of issuing a domestic violence restraining order and those that fall instead into the category of 'ordinary domestic contretemps' . . . ." J.D., 207 N.J. at 475. "[T]he decision about whether a

particular series of events rises to the level of harassment or not is fact-sensitive." Id. at 484. Jack did not argue in the trial court that pouring water on Ellen's head was ordinary domestic contretemps. Rather, he denied having engaged in that behavior. The trial court, therefore, did not have an opportunity to decide the issue. Our review of the record, however, reveals no evidence supporting the notion that the sudden dumping of water on a romantic partner's head during a public argument is anything other than harassment.

Contempt of a domestic violence order also is a predicate act of domestic violence. N.J.S.A. 2C:25-19(a)(17). Jack concedes he repeatedly violated the TRO while aware he had been ordered by the court not to contact Ellen. He attempts to excuse his behavior by claiming he was "love sick" and wanted to rekindle their relationship. The record, however, establishes that Jack could not find a place to live and wanted to return to Ellen's apartment. In either case, Jack offered no valid excuse for his deliberate violations of the TRO.

We have considered Jack's remaining arguments and conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). The trial court's questioning of Ellen did not exceed its authority and the record

13

amply supports the conclusion that entry of an FRO to protect Ellen from future acts of domestic violence by Jack was warranted.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

14